213 N.J. Super. 98 (1986)
516 A.2d 628
MELVIN HEARON, SR. AND ELVA HEARON, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
BURDETTE TOMLIN MEMORIAL HOSPITAL, DR. ROBERT J. SORENSEN, DR. RODOLFO GARCIA AND DR. JOHN DOE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 1986.
Decided October 6, 1986.
*99 Before Judges KING, DEIGHAN and HAVEY.
Michael J. Glassman argued the cause for appellant (William T. DiCiurcio, attorney, of counsel and on the brief).
Robert E. Paarz argued the cause for respondent Dr. Robert Sorensen (Horn, Kaplan, Goldberg, Gorny & Daniels, attorneys; Robert E. Paarz, of counsel; Thomas J. Potter, on the brief).
The opinion of the court was delivered by DEIGHAN, J.A.D.
Plaintiffs Melvin Hearon, Sr. and Elva Hearon, his wife appeal from a summary judgment, granted after commencement of trial, dismissing their complaint for medical malpractice. Prior to trial a summary judgment had been granted in favor of defendant Burdette Tomlin Memorial Hospital and, prior to the commencement of trial plaintiffs submitted to a judgment of voluntary dismissal of their complaint against defendant Dr. Rudolfo Garcia, R. 4:37-1(b).
After plaintiffs and their daughter had testified their medical expert, Luketu Nanavati, M.D. was the next witness to be presented. However, just prior to presenting his testimony, counsel for defendant Robert Sorensen, M.D. moved to bar any testimony of Dr. Nanavati or alternatively for summary judgment based upon his deposition taken the day prior to trial. After hearing argument of counsel and examining the deposition, *100 the trial court entered a "summary judgment" dismissing the complaint.

I.
In December 1980, plaintiff Melvin Hearon, Sr. experienced shortness of breath and chest pain. He consulted his family physician, Dr. Garcia, who admitted plaintiff to the Burdette Tomlin Memorial Hospital. Dr. Garcia prescribed 40 milligrams of inderal three times a day. Inderal is a drug which reduces the heart's demand for oxygen and reduces heart pain or angina.
Dr. Garcia had plaintiff examined by Dr. Sorensen, an internist and Chief of Medicine on the hospital staff. Dr. Sorensen's first examination revealed a murmur over plaintiff's left artery.[1] He suggested that plaintiff undergo a coronary anteriography and that plaintiff's dosage of inderal be reduced to 20 milligrams three times daily.
This dosage continued until January 20, 1981 at which time Dr. Sorensen determined that plaintiff "was having increased angina and an impending heart attack." He recommended that the inderal be increased to the original dosage of 40 milligrams. On January 20 and 21, upon Dr. Sorensen's recommendation, two doses of inderal were withheld because of a decline in plaintiff's blood pressure. Sometime between January 20 and 22, 1981, plaintiff suffered an acute myocardial infarction. Subsequently, he was transferred to the services of Dr. Nanavati and later taken to the Presbyterian-University of Pennsylvania Medical Center. As a result of the heart attack plaintiff has been unable to return to work and is incapable of doing any household chores.
Before Dr. Nanavati was called to testify, defense counsel furnished the court with a copy of his deposition and moved to *101 bar the doctor's testimony or for a "summary judgment." Defense counsel referred to portions of Dr. Nanavati's deposition which seemed to indicate that Dr. Sorensen's treatment was not improper. Dr. Nanavati was not specifically asked at his deposition if Dr. Sorensen deviated from a medical standard to a reasonable degree of medical probability; he admitted that there is medical authority both for and against the proposition that inderal may aggravate the type of angina suffered by plaintiff. Dr. Nanavati also admitted that there are competent physicians who believe that inderal aggravates this type of angina and other competent physicians who hold the opposite view. Dr. Nanavati further stated that it would be appropriate for a physician who believed that inderal may aggravate the type of angina sustained by plaintiff to decrease the inderal dosage. The trial court did not read the deposition, but merely perused it during the arguments of counsel. After hearing these arguments the court then concluded, that although Dr. Nanavati was not specifically asked "what standard did Dr. Sorensen deviate from," if he had been asked, "he would have had no answer," and granted defendant's motion for summary judgment.
Plaintiffs contend the trial court erred in granting the summary judgment because: (1) the issue of whether a medical doctor deviated from the standard of care is a factual question to be determined by a jury; (2) direct testimony of plaintiff's expert would have created a material issue of fact; (3) the trial court failed to closely scrutinize the evidence, and (4) excerpts of Dr. Nanavati's deposition presented by defense counsel were taken out of context. The defendant responds that Dr. Nanavati's deposition testimony did not establish a deviation from the standard of care by Dr. Sorensen and therefore his testimony must be barred and the complaint dismissed.

II.
Generally, in a malpractice action where a physician is charged with negligence in the treatment of a patient, the *102 standard of skill and knowledge of medical practice to which the physician failed to adhere must be established by expert testimony. Rosenberg by Rosenberg v. Cahill, 99 N.J. 318, 325 (1985); Sanzari v. Rosenfeld, 34 N.J. 128, 135 (1961). "The expert testimony must relate to generally accepted medical standards, not merely to standards personal to the witness." Fernandez v. Baruch, et. al., 52 N.J. 127, 131 (1968); see Carbone v. Warburton, 11 N.J. 418, 425 (1953).
In his argument, plaintiffs' attorney in effect made an offer of proof, R. 1:7-3, that Dr. Nanavati's direct testimony would have "covered points made in his submitted report of how defendant deviated from an accepted standard of care." Unfortunately, the trial court was not presented with, nor did he request, a copy of Dr. Nanavati's medical report concerning his opinion on deviation of the standard of care by Dr. Sorensen. Prior to argument before this court we requested plaintiffs' attorney to produce Dr. Nanavati's report for our examination. In his report dated April 24, 1984, Dr. Nanavati reviewed the medical history and hospital records of plaintiff and the events leading up to plaintiff's myocardial infarction. He then concluded:
He is totally disabled because of the acute myocardial infarction and the narrowing of multiple blood vessels. His prognosis is very much guarded.
In my professional opinion there was a deviation from standard medical care.
1. In a patient with recurrent chest pain and pain at rest, the standard medical care would include increasing the dose of Inderal and adding nitration.
2. When the patient was complaining of chest pain he was given a cholangiogram and an upper gastrointestinal series, both the tests in clinical set up were unnecessary and to a certain extent harmful.
3. On 1/20/81, the [with] holding of Inderal in spite of increasing angina is contraindicated and may have caused the myocardial infarction.
4. When the patient's condition deteriorated further and a Swanganz was needed, the patient was treated arbitrarily.
In summary, even though there had been ample time to have stabilized the patient with medical therapy, cardiac catherization or possible surgery, that valuable time was wasted due to unnecessary testing. Consequently the patient who was admitted for uncontrolled angina, suffered an acute myocardial infarction. The long term prognosis is extremely guarded.
*103 A review of the medical report by the trial court would have revealed that Dr. Nanavati predicated his opinion that "there was a deviation from standard medical care," on four different theories. Although Dr. Nanavati stated that the "stoppage of the inderal seems to have [sic] predominant role in causing the myocardial infarction of this patient," he also admitted that there were other possibilities that might have caused the heart attack. Dr. Nanavati refused, however, to indicate a percentage of possibilities for each cause. Given the circumstances surrounding the patient's illness, Dr. Nanavati stated that he would have treated plaintiff more aggressively, however, he was never asked by defendant's attorney whether there was a deviation from a standard of medical care to a reasonable degree of medical probability. Indeed, the report does not spell out a deviation of any medical standard in legal terms to a degree of medical probability. Nevertheless, this failure to specify a deviation of medical standards in the appropriate legal terms is not fatal to this case. Legal standards are usually talismanic to a practicing physician unfamiliar with legal nuances and terminology. Undoubtedly, before his trial testimony, plaintiffs' attorney would have apprised Dr. Nanavati that the legal requirement of causation must be established to a reasonable degree of medical probability. So informed, Dr. Nanavati could then respond more appropriately on direct examination.
Since Dr. Nanavati was in court prepared to testify, the better procedure would have been first, for the trial judge to examine the medical report and, if he had any doubt as to the sufficiency of the proffered proofs, he should then have questioned Dr. Nanavati out of the presence of the jury before granting a summary judgment. Fantini v. Alexander, 172 N.J. Super. 105 (App.Div. 1980). We realize that Dr. Nanavati's deposition testimony of what he would do is not the generally recognized standard, Fantini at 110-111, nevertheless, if affirmatively responsive to the question of whether what he would do was the generally recognized standard, his opinion would be sufficient to present a jury question. Id. at 111.
*104 If Dr. Nanavati's expert testimony on voir dire was not established as sufficient, then, since plaintiff had no further medical testimony to offer, the complaint could have been dismissed. However, even if the medical testimony was weak, the procedure should have been to admit Dr. Nanavati's testimony. If the testimony failed to establish an accepted standard of care for a medical malpractice action, the trial court, at that point, could have granted a dismissal at the close of all of the plaintiffs' testimony on liability. R. 4:37-2(b). See Sanzari v. Rosenfeld, 34 N.J. at 135, and see also Fernandez v. Baruch, supra, at 131, relied upon by trial court.
In complex cases such as a medical malpractice action, reliance upon facts developed at discovery as constituting all the relevant facts may lead to an inaccurate factual assessment. In depositions, discovery may be limited to certain critical areas which the deposing party may wish to develop and establish. Where a party's witness is being deposed, the party is not required, and for strategic purposes may not desire, to fill in any gaps omitted or glossed over by the deposing party. Nor is a party required to present all facts at the deposition. The deposing party usually seeks to discover and develop facts, to limit testimony at trial, to prepare for impeachment and to prevent surprise. The limitations of deposition testimony have been carefully pointed out by the West Virginia Supreme Court in Masinter v. Webco Co., 164 W. Va. 241, 262 S.E.2d 433, 436 (1980).
Frequently, discovery depositions of the parties or their key witnesses do not reflect all relevant facts. This is because these depositions are taken by adverse counsel and the deponents do not care to volunteer information and, therefore, they give limited answers to the questions. While discovery procedures are useful to develop the facts of a case, there is no requirement that all facts must be developed through discovery, and, certainly no grounds for the assumption that they have been developed by discovery.
A summary judgment is an extraordinary measure opposed to the policy of law that each litigant be afforded the opportunity to air fully his case. Robbins v. Jersey City, 23 N.J. 229, 240 (1957). Accordingly, trial courts are admonished to grant a *105 motion for summary judgment only with extreme caution, Devlin v. Surgent, 18 N.J. 148, 154 (1955), and a trial court should be particularly cautious to grant a summary judgment when a cause of action rests upon expert testimony. Ruvolo v. American Cas. Co. 39 N.J. 490, 500 (1963). "[S]ight should never be lost of the fact that such procedure is no substitute for a full plenary trial." United Advertising Corp. v. Metuchen, 35 N.J. 193, 196 (1961). Cf. United Rental Equipment Co. v. Aetna Life & Cas. Ins. Co., 74 N.J. 92, 100-102 (1977).
We are convinced that the decision to preclude Dr. Nanavati's testimony based solely upon his deposition taken by defense counsel and the resulting dismissal of the complaint was error.
Reversed and remanded.
NOTES
[1] Since neither defendant nor plaintiffs' expert testified, these facts are taken from their depositions.